IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

John F. M.,[1]                          )        C/A No.: 1:23-1126-SVH
                                        )
              Plaintiff,                )
                                        )
     vs.                                )
                                        )                ORDER
Kilolo Kijakazi, Acting                 )
Commissioner of Social Security         )
Administration,                         )
                                        )
              Defendant.                )
_____ )

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Bruce Howe Hendricks, United States District Judge, dated March 28, 2023, referring this matter for disposition. [ECF No. 6]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 5].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are

_____

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.     Relevant Background

A.     Procedural History

On March 31, 2019, Plaintiff protectively filed an application for DIB in which he alleged his disability began on June 18, 2018. Tr. at 80, 188–89. His application was denied initially and upon reconsideration. Tr. at 100–03, 107–12. On May 4, 2021, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Tammy Georgian. Tr. at 31–64 (Hr'g Tr.). The ALJ issued an unfavorable decision on May 14, 2021, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 12–30. The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Plaintiff subsequently brought an action seeking judicial review of the Commissioner's decision in this court.

On April 20, 2022, the undersigned issued an order granting the Commissioner's motion to remand, reversing the Commissioner's decision under sentence four of 42 U.S.C. § 405(g), and remanding the cause to the Commissioner for further administrative proceedings. Tr. at 922–24. The

Appeals Council issued an order remanding the case to the ALJ on July 20, 2022. Tr. at 931–37. The ALJ held additional hearings on November 15, 2022,[2] and December 8, 2022. Tr. at 875–87, 888–96. She issued a second unfavorable decision on January 18, 2023. Tr. at 851–74. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on March 21, 2023. [ECF No. 1].

B.     Plaintiff's Background and Medical History

1.     Background

Plaintiff was 60 years old at the time of the first hearing and 62 years old at the time of the second and third hearings. Tr. at 65. He completed two years of college. Tr. at 39. His past relevant work ("PRW") was as a logistics specialist for the United States Navy. Tr. at 886. He alleges he has been unable to work since June 18, 2018. Tr. at 188.

2.     Medical History

On June 19, 2018, Plaintiff presented to neurologist Marshall White, M.D. ("Dr. White"), with complaints of severe low back pain radiating to his right leg following a car accident the prior day. Tr. at 477. Dr. White noted Plaintiff had a history of three low-back surgeries. *Id.* He prescribed Norco 10/325 mg and instructed Plaintiff to follow up in a week. Tr. at 477, 478.

---

[2] At the beginning of the hearing on November 15, 2022, Plaintiff's counsel informed the ALJ that he was scheduled for an appointment with a neurologist. Tr. at 892. The ALJ continued the hearing without taking Plaintiff's testimony. Tr. at 894.

On June 29, 2018, Plaintiff reported severe low-back pain radiating into his right leg, knee pain, and headaches. Tr. at 475. He indicated his family doctor had prescribed Imitrex, and he was taking it several times a week. *Id.* Dr. White prescribed Verapamil as a migraine preventative and noted Plaintiff was likely having post-traumatic headaches. *Id.* He ordered magnetic resonance imaging ("MRI") of Plaintiff's lumbar spine. *Id.*

On July 5, 2018, Plaintiff presented to Medical University of South Carolina ("MUSC") Neurosurgery Spine with complaints of back pain and migraine following a car accident on June 18. Tr. at 508. Family nurse practitioner Margaret K. Brothers ("NP Brothers") prescribed a Medrol Dosepak and ordered an MRI of Plaintiff's lumbar spine. *Id.*

Plaintiff followed up with NP Brothers to discuss the MRI results on July 12, 2018. Tr. at 507. The MRI showed degenerative disc disease ("DDD") with prior hemilaminectomy at L4–5 and laminectomy at L5–S1 and multilevel facet hypertrophy and ligamentum thickening that caused severe lateral foraminal narrowing to the right at L4–5. Tr. at 507, 549–52. It also indicated a symmetric disc protrusion at L2–3, resulting in mild neural foraminal narrowing. *Id.* NP Brothers discussed administering injections and prescribing Neurontin and indicated Plaintiff planned to continue physical therapy. Tr. at 507.

On August 3, 2018, Plaintiff complained of pain in his right low back, leg, buttock, and groin in L2, L3, L4, and L5 distributions. Tr. at 420. He rated his pain as a seven on a 10-point scale. *Id.* He endorsed frequent or recurrent headaches that caused problems with concentration or thought process. Tr. at 421. Pain management physician Todd Joye, M.D. ("Dr. Joye"), observed Plaintiff to appear uncomfortable and in distress with limited range of motion ("ROM") of the lumbar spine, moderate tenderness to deep palpation over the bilateral paravertebral areas, bilateral iliolumbar areas, and right sciatic notch, mild spasm over the right iliolumbar area, positive straight-leg raising ("SLR") on the right in the seated position, and increased pain with lumbar flexion, extension, lateral bending, and rotation. *Id.* He administered transforaminal epidural steroid injections ("TESIs") at the right L2–3 and L4–5 levels. Tr. at 421–22. He assessed radiculopathy of the lumbar region, sprain of the lumbar region, and migraine. Tr. at 422.

On August 15, 2018, Plaintiff reported to Dr. White that the TESIs had not fully relieved his pain and that he was considering a second series of injections. Tr. at 474. Dr. White noted Plaintiff required narcotic pain medication and that he had placed him on a narcotic contract. *Id.* He stated Plaintiff was experiencing daily headaches and taking Imitrex frequently. *Id.* He indicated he would prefer to have Plaintiff on a preventive medicine, but Verapamil was not working, and he did not want to add Topamax to the other

psychoactive medications. *Id.* He recommended Plaintiff undergo Botox injections. *Id.*

On August 24, 2018, Plaintiff reported the TESIs had improved his pain by 25–50%. Tr. at 423. Dr. Joye observed Plaintiff to appear uncomfortable and in distress consistent with his pain complaint. *Id.* He administered TESIs at the right L4–5 and L5–S1 levels. Tr. at 424–25.

On September 17, 2018, Plaintiff underwent surgery to remove a malignant melanoma from his left posterior calf. Tr. at 503.

On September 19, 2018, Dr. White indicated Plaintiff continued to experience chronic pain in his back and knees, neck pain, and cervicogenic headaches accompanied by nausea. Tr. at 469. He noted he was prescribing Imitrex, Zofran, and Norco and that he would continue to follow Plaintiff monthly. *Id.*

Dr. White prepared a letter to Plaintiff's employer on September 26, 2018. Tr.at 470. He noted Plaintiff continued to experience constant, moderate pain and periods of severe pain and spasms, despite having received two series of TESIs. *Id.* In a separate letter, Dr. White noted Plaintiff required minimal stress and limited physical movement due to his medical conditions. Tr. at 472.

Dr. White noted Plaintiff was experiencing daily headaches on October 17, 2018. Tr. at 467. He prescribed Verapamil SR 180 mg and indicated a

desire to decrease Plaintiff's use of Imitrex, as he was concerned about rebound-type headaches. *Id.* He stated he wanted Plaintiff to avoid using Imitrex unless it was absolutely necessary. *Id.* He also refilled Norco 10/325 mg. Tr. at 468.

On December 12, 2018, Dr. White indicated Plaintiff continued to deal with problems related to the car accident. Tr. at 465. He stated Plaintiff had not obtained sustained relief through injections. *Id.* He continued to prescribe Norco for intractable pain and right-sided sciatica. *Id.* He explained that Plaintiff was experiencing concussive-type symptoms involving daily headaches that had decreased in frequency with Verapamil, allowing him to use Imitrex less frequently. *Id.*

Plaintiff endorsed headaches and fatigue during a primary care visit on December 17, 2018. Tr. at 499. He indicated he was sleeping only about six hours per night and felt tired and as if he could take a nap at any point. *Id.* Harriet Hansen, D.O. ("Dr. Hansen"), noted Plaintiff scored very high on a sleep scale and suspected he might have obstructive sleep apnea. *Id.* She recommended Plaintiff undergo a sleep study. *Id.*

Plaintiff presented to orthopedist Brodie McKoy, M.D. ("Dr. McKoy"), on December 20, 2018, for a routine follow up from right knee surgery performed on November 30, 2017. Tr. at 432–35. He reported some continued tenderness and a mild limp, at times, but generally indicated his right knee

was doing well. Tr. at 434. Dr. McKoy noted mild effusion of the right knee, but otherwise normal findings. Tr. at 434–35. He reassured Plaintiff that he was doing well and that x-rays showed his hardware to be well-aligned. Tr. at 435.

Dr. White refilled Norco 10/325 mg on January 16, 2019. Tr. at 463. He noted Plaintiff was alert, oriented, and stable from a cardiovascular standpoint. *Id.*

On February 27, 2019, Plaintiff reported his headaches were less frequent on Verapamil, but he continued to experience them. Tr. at 461. Dr. White indicated he had advised Plaintiff to stay away from Imitrex because he did not want cardiac vasospasm to become an issue. *Id.* He prescribed Norco 10/325 mg and Verapamil SR 240 mg. Tr. at 462.

On April 25, 2019, Plaintiff demonstrated swelling over his right knee and reported pain and numbness down his leg and into his foot. Tr. at 736. Dr. McKoy administered a Depo-Medrol injection to Plaintiff's right hamstring tendon joint. *Id.*

Dr. White prepared a letter to Plaintiff's supervisor on May 9, 2019. Tr. at 695–96. He explained medications and injections had provided Plaintiff little relief and he continued to have muscle spasms and require narcotic medications for chronic pain. Tr. at 696. He stated Plaintiff was not a candidate for additional surgery and required continued pain management.

*Id.* He noted Plaintiff experienced daily post-concussive headaches and required minimal stress and limited movement. *Id.* He indicated Plaintiff had been compliant with treatment. Tr. at 695. He stated he did not expect any significant improvement in Plaintiff's conditions. Tr. at 696.

On June 10, 2019, Plaintiff reported the injection to his right hamstring during the prior visit had provided minimal relief. Tr. at 732. He described feeling tight in his right anterior knee and low back. *Id.* Dr. McKoy observed mild effusion to the right knee. *Id.* He administered a Depo-Medrol injection to Plaintiff's right hamstring joint. *Id.*

Plaintiff presented to consultative examiner John Custer, M.D. ("Dr. Custer"), for a mental status exam on June 24, 2019. Tr. at 622–24. He stated the pain he experienced following the car accident had prevented him from focusing to perform his job, which required a high level of attention. Tr. at 622. He reported feeling depressed and taking Prozac. Tr. at 622, 623. He indicated he did paperwork and paid bills, although it took him "way longer than it used to." Tr. at 623. Dr. Custer observed Plaintiff to walk with a slight limp, to be restless while sitting, and to complain of pain. *Id.* He noted Plaintiff was alert and fully oriented and had normal speech, logical and goal-directed thought process, appropriate affect, no suicidal ideation, no evidence of loose associations, flight of ideas, or bizarre thought content, and no evidence of psychosis. *Id.* He indicated Plaintiff scored 26 of 30 on the

Folstein Mini-Mental Exam, as he recalled past presidents back to Clinton, was able repeat three of three objects immediately and one of three after a five-minute delay, had three correct and two incorrect responses on serial sevens, and was able to follow a three-stage command and copy a geometric design. Tr. at 623–24. He diagnosed somatic symptom disorder and mood disorder secondary to medical illness. Tr. at 623–24. He noted Plaintiff could have "some mild decrease in his cognitive functioning due to pain." Tr. at 624.

Plaintiff reported an exacerbation of back and knee pain on July 3, 2019. Tr. at 694. Dr. White refilled Verapamil for post-traumatic headaches. *Id.*

Plaintiff presented to consultative examiner Lisa Hewett, M.D. ("Dr. Hewett"), for an orthopedic exam on July 20, 2019. Tr. at 626–29. He reported three migraines per month that lasted three days. Tr. at 626. He indicated his migraines were exacerbated by sunlight, fluorescent light, and stress and required he lie down in dark room and do nothing. *Id.* He endorsed back pain that was worsened by standing and walking, knee pain, and occasional episodes in which his right knee would give out. *Id.* He indicated he cooked for his family, took his grandsons to and from school, helped his grandsons with homework, and sometimes hired a babysitter to assist around the house when he was incapacitated due to migraines. Tr. at 627. Dr. Hewett observed Plaintiff to demonstrate stiffness with all movements,

limited lumbar ROM and internal rotation and abduction of the shoulder, stiff gait, decreased ROM of the right knee, ability to bend and squat halfway, visible effort upon rising from a seated position, decreased reflexes in the left patella, absent reflexes in the right patella, decreased sensation in the right medial thigh and lower leg, positive SLR, and decreased strength to right hip flexion, right knee flexion and extension, and right foot dorsiflexion. Tr. at 628. She diagnosed low back pain secondary to degenerative spondylosis with radiculopathy affecting L3–4 bilaterally and L4–5, migraines, and knee pain likely due to progression of osteoarthritis. Tr. at 629. Dr. Hewett wrote:

> Based on today's examination and the objective evidence, I believe the claimant can hold a conversation, respond appropriately to questions, carry out and remember instructions. The claimant is likely to have limitations regarding his ability to carry and reach given aggravation of his low back pain. He is also likely to require flexibility in how he positions himself throughout the day because any given posture causes pain for a prolonged period of time and because standing/walking may pose a fall hazard given his knee weakness. As far as his migraines and the mental toll that these take on him, I saw no objective evidence of any impairment which would preclude him from doing the mental work required of him for example in his previous job. This is, of course, an inherent limitation of having an examination when he is not currently experiencing a migraine.

*Id.*

State agency psychological consultant Michael Neboschick, Ph.D., reviewed the evidence and completed a psychiatric review technique on July 22, 2019. Tr. at 72–73. He considered listings 12.04 for depressive, bipolar,

and related disorders, 12.07 for somatic symptom and related disorders, and 12.11 for neurodevelopmental disorders and assessed no difficulties in Plaintiff's ability to interact with others and mild difficulties in his abilities to understand, remember, or apply information, concentrate, persist, or maintain pace, and adapt or manage oneself. *Id.* A second state agency psychological consultant, Celine Payne-Gair, Ph.D., reviewed the evidence, considered the same listings, and assessed the same degree of difficulty in each of the four areas of mental functioning on April 20, 2020. *Compare* Tr. at 72–73, *with* Tr. at 90–91.

On August 21, 2019, state agency medical consultant Isabella McCall, M.D. ("Dr. McCall"), reviewed the record and assessed Plaintiff's physical residual functional capacity ("RFC"). Tr. at 74–76.

On September 17, 2019, Plaintiff complained of weight gain, low energy, taking two to three naps per day, and low back and bilateral shoulder and neck pain that was worse with overhead reaching. Tr. at 649. Dr. Hansen observed Plaintiff to demonstrate pain with overhead arc and crossarm test on the left worse than the right and positive Neer sign on the left. *Id.* She assessed neck and bilateral shoulder pain/tendinopathy and malaise and recommended Plaintiff take two Aleve tablets twice a day, participate in physical therapy, obtain lab studies, and schedule a sleep test. Tr. at 650.

Plaintiff underwent a sleep study on October 2, 2019, that showed mild obstructive sleep apnea. Tr. at 654–57.

On October 11, 2019, the United States Office of Personnel Management issued a letter approving Plaintiff for disability from his position as an administrative specialist due to chronic pain syndrome. Tr. at 662–65.

On October 16, 2019, Robert Daniel Vorona, M.D., ordered a home automatic positive airway pressure ("APAP") trial for treatment of obstructive sleep apnea. Tr. at 672–73.

On October 23, 2019, Dr. White noted he did not blame Plaintiff for declining to undergo additional back surgery. Tr. at 693. He stated Plaintiff continued to require periodic Norco to manage his chronic pain and prescribed 60 Norco 10/325 mg tablets to be taken every 12 hours as needed for pain. *Id.*

On October 24, 2019, Plaintiff presented for evaluation of bilateral shoulder pain. Tr. at 725. He stated he had first noticed the pain around two months prior, when he was bench pressing weight. Tr. at 727. Dr. McKoy noted tenderness of the bilateral acromioclavicular ("AC") joints and positive bilateral Hawkins and Neer tests. Tr. at 728. X-rays showed moderate osteoarthritis of the AC joints. *Id.* Dr. McKoy administered Depo-Medrol injections to Plaintiff's bilateral shoulders. *Id.* He assessed primary

osteoarthritis of the bilateral shoulders, bilateral shoulder pain, and obesity with a body mass index ("BMI") greater than 30. Tr. at 728–29.

On December 5, 2019, Plaintiff reported good relief from the bilateral shoulder injections he received in October and requested a Depo-Medrol injection to address tightness in his left shoulder. Tr. at 784. Dr. McKoy observed tenderness of the bilateral AC joints, and positive bilateral Hawkins and Neer tests. *Id.* He administered a Depo-Medrol injection to the left shoulder subacromial joint space. *Id.* He advised Plaintiff to follow up with his spine doctor because his back problems might be causing the pain in his right knee. Tr. at 785.

On January 31, 2020, Plaintiff reported low back, right leg, right knee, and right buttock pain and requested an injection. Tr. at 838. Clinical physician assistant Jennifer Pederson observed Plaintiff to appear uncomfortable with distress appropriate to his pain complaint, antalgic gait, limited ROM of the lumbar spine, mild tenderness to deep palpation in the right iliolumbar area, sacroiliac area, and sciatic notch, positive SLR on the right, and pain increased with lumbar flexion, extension, lateral bending, and rotation. Tr. at 839. Dr. Joye administered TESIs at Plaintiff's right L4–5 and L5–S1 levels. Tr. at 839–40.

On February 3, 2020, Dr. McKoy noted tenderness to the bilateral AC joints and positive bilateral Hawkins and Neer tests. Tr. at 780. He reviewed

x-rays of Plaintiff's right knee that showed his prosthesis to be well-aligned and in a good position. *Id.* He advised Plaintiff to continue activity as tolerated and to use rest, ice, and nonsteroidal anti-inflammatory drugs for pain or inflammation. *Id.*

Dr. Hansen took over prescribing Norco and treating Plaintiff for back pain and migraine headaches following Dr. White's retirement. Tr at 771. On February 19, 2020, Plaintiff reported his mood was good and sought to wean off Prozac because he feared it was contributing to his weight gain. Tr. at 803. He indicated he continued to experience migraines a couple times a month. *Id.* He said that if he used Imitrex right away and took a nap, his headache would resolve. *Id.* He stated he was trying to exercise at the pool. *Id.* Dr. Hansen instructed Plaintiff to wean off Prozac and prescribed Ritalin for attention deficit disorder ("ADD") and Diltiazem, Imitrex, and Zofran for migraines. Tr. at 804.

On February 24, 2020, Plaintiff reported experiencing migraines a couple times per month and treating them by taking Imitrex and lying down. Tr. at 803. Dr. Hansen prescribed Diltiazem, Zofran, and Imitrex for migraines. Tr. at 804.

Plaintiff participated in a virtual phone visit with Dr. Hansen on May 11, 2020. Tr. at 805. He indicated he had weaned off Prozac and his mood was good. *Id.* He said he continued to experience migraines twice a month that

would resolve if he took Imitrex and a nap right away. *Id.* Dr. Hansen refilled Plaintiff's medications. *Id.*

On August 26, 2020, Plaintiff reported feeling down and stressed and noted he would be home schooling his grandsons for the semester. Tr. at 810. He said his migraines were occurring about three times a week, but continued to resolve if he took Imitrex right away and napped. *Id.* Dr. Hansen added Amitriptyline 10 mg for migraines and to improve Plaintiff's mood. *Id.*

On August 27, 2020, Plaintiff reported having received four months of relief from the prior TESIs and requested repeat injections. Tr. at 847. Dr. Joye observed Plaintiff to appear uncomfortable due to pain and to demonstrate distress appropriate to his pain complaint, antalgic gait, limited ROM of the lumbar spine, moderate tenderness to deep palpation in the bilateral paravertebral areas, bilateral iliolumbar areas, and right sciatic notch, mild spasm in the right iliolumbar area, positive SLR on the right, and pain increased with lumbar flexion, extension, lateral bending, and rotation. *Id.* He administered TESIs at the right L4–5 and L5–S1 levels. Tr. at 848.

Plaintiff presented to William Maguire, Jr., M.D. ("Dr. Maguire"), for an orthopedic consultative exam on September 1, 2020. Tr. at 747–49. He reported chronic low back pain that radiated to his hips and down his right leg, causing tingling, numbness, and weakness. Tr. at 747. He indicated he

typically experienced three migraines per week that lasted three to four hours each time and were associated with nausea, photophobia, and pain with light. *Id.* He also endorsed muscle spasms behind his right knee, depression, anxiety, and ADD. *Id.* Dr. Maguire noted the following abnormalities: "something of a depressed demeanor," ambulation with a slight right-sided limp; tingling and numbness over the right knee; 3/4 motor function in the right leg; 1/4 reflexes in the right patella and to right ankle jerk; positive SLR on the right; lumbar flexion to 30 degrees; inability to perform lateral flexion or extension; right knee flexion to 10 degrees; and left knee flexion to 90 degrees. Tr. at 748. He opined that Plaintiff would have difficulty with work requiring a lot of standing, walking, squatting, bending, and crawling, especially over an eight-hour day. Tr. at 749. He further noted Plaintiff would be subjectively limited during migraine episodes. *Id.*

On October 11, 2020, state agency medical consultant James M. Lewis, M.D. ("Dr. Lewis"), reviewed the record and assessed Plaintiff's physical RFC. Tr. at 93–96.

Plaintiff endorsed shoulder pain on October 15, 2020. Tr. at 773. He reported his right knee was doing well. *Id.* Dr. McKoy noted tenderness to the bilateral AC joints and positive bilateral Hawkins and Neer tests. *Id.* He administered Depo-Medrol injections to Plaintiff's bilateral shoulders. Tr. at 773–74.

Plaintiff presented to nurse practitioner Tracy Lynn Caldwell ("NP Caldwell") with various complaints on November 5, 2020. Tr. at 815. He reported a non-healing laceration to his left arm. *Id.* He described muscle spasms in his back, left thigh, neck, and jaw over the prior four days and indicated he was under a lot of stress because his wife was sick. *Id.* NP Caldwell administered a tetanus shot and prescribed an antibiotic for cellulitis. Tr. at 819. Plaintiff declined blood work to further assess the reason for his muscle spasms and stated he would use over-the-counter magnesium and remaining doses of Flexeril from a prior prescription and follow up if he failed to improve. *Id.*

On May 24, 2021, Plaintiff complained of three to four migraines per week. Tr. at 1174. He indicated he treated the migraines by taking Imitrex immediately and lying down. *Id.* He indicated he had previously tried Diltiazem and Amitriptyline without relief. *Id.* He said he continued to take Norco twice a day and receive TESIs from Dr. Joye that provided about six weeks of pain relief. Tr. at 1173. Dr. Hansen prescribed Topamax 50 mg in addition to Imitrex and Zofran, referred Plaintiff to a neurologist, and instructed him to keep a headache log. *Id.*

Plaintiff endorsed increased back pain on October 28, 2021. Tr. at 1163. He indicated he was taking Norco for pain and planned to follow up with Dr. Joye for injections. *Id.* He reported migraines once a week that resolved after

taking Imitrex right away and napping. *Id.* He indicated he had discontinued Amitriptyline because he did not like how it made him feel and had previously tried Diltiazem and Topamax without benefit. *Id.* Dr. Hansen refilled Imitrex and Zofran and recommended Plaintiff follow up with a neurologist for migraine treatment. Tr. at 1164.

On November 15, 2021, Plaintiff reported his symptoms had started returning in the same area one to two weeks prior and requested repeat TESIs. Tr. at 1623. Dr. Joye observed Plaintiff to appear uncomfortable and to demonstrate distress appropriate to his pain complaint, limited ROM of the lumbar spine, moderate tenderness to deep palpation, mild spasm in the right iliolumbar area, positive SLR on the right, and increased pain with lumbar flexion, extension, lateral bending, and rotation. Tr. at 1624. He administered TESIs at Plaintiff's right L4–5 and L5–S1 areas. Tr. at 1624–25.

On January 31, 2022, Plaintiff reported his shoulder pain was waking him during the night. Tr. at 1658. Dr. McKoy noted bilateral AC joint tenderness and positive bilateral Neer and Hawkins tests. *Id.* He administered a Depo-Medrol injection to Plaintiff's left shoulder. Tr. at 1659.

On March 7, 2022, Plaintiff complained of waking during the night with leg cramps and experiencing migraines once a week that resolved upon taking Imitrex right away and napping. Tr. at 1630. He indicated he had felt

"foggy" lately and often forgot to take his second dose of Ritalin for ADD. *Id.* Dr. Hansen increased Gabapentin to 300 mg and switched Ritalin to Ritalin XR 20 mg. Tr. at 1631.

On September 21, 2022, Dr. Hansen prepared a letter stating Plaintiff's chronic back pain and migraine headaches would make it difficult for him to perform "prolonged sitting, standing, physical or computer work." Tr. at 1648.

Plaintiff returned to Dr. McKoy for treatment of bilateral shoulder pain on September 27, 2022. Tr. at 1653. He reported the pain woke him during the night and was worse on the right. *Id.* Dr. McCoy noted tenderness over the bilateral AC joints and positive bilateral Hawkins and Neer tests. *Id.* He diagnosed a complete tear of the right rotator cuff and primary osteoarthritis of the bilateral shoulder region. *Id.* He discussed treatment options that included right shoulder arthroscopy, cortisone injections, and physical therapy, but recommended arthroscopy. *Id.* Plaintiff agreed to proceed with surgery. *Id.*

Plaintiff presented to neurologist Thomas Hughes, M.D. ("Dr. Hughes"), for evaluation of migraines on November 22, 2022. Tr. at 1664. He reported a 20-year history of migraines that had progressed from once a month to daily. *Id.* Dr. Hughes assessed chronic migraine without aura and unspecified insomnia. Tr. at 1665. He indicated contributing factors included insomnia, ADD, low back pain, chronic opioids, caffeine, and Ritalin. *Id.* He

recommended Botox therapy, although he advised Plaintiff that he may see limited success if he continued chronic opioid therapy. Tr. at 1662–66. He indicated Plaintiff might need to miss work periodically for severe headaches. Tr. at 1666.

## C. The Administrative Proceedings

### 1. The Administrative Hearing

#### a. Plaintiff's Testimony

##### i. First Hearing

At the hearing on May 4, 2021, Plaintiff testified he lived with his wife and two grandsons, ages 9 and 13. Tr. at 37–38. He said he had served as his grandsons' legal guardian for eight years. Tr. at 38. He stated his wife was disabled as a result of being deaf and nearly blind, vertigo, a broken back and neck, difficulty walking, and chronic digestive problems. *Id.* He indicated his household income consisted of his wife's disability benefits and his disability income from the Navy. *Id.*

Plaintiff confirmed that he had a driver's license and was able to drive. Tr. at 39. He said he had worked as a logistics management specialist for the Navy for the last 15 years. Tr. at 39–40.

Plaintiff explained that he had undergone back surgery and had started to develop migraines prior to being injured in a car accident on his way to work. Tr. at 40. He said he visited a doctor the day after the accident

and started a pain management routine. Tr. at 41–42. He stated he had desired to avoid additional surgery, as his heart rate had dropped to 5 beats per minute during one surgery and his spinal cord had been nicked during another surgery. Tr. at 42.

Plaintiff testified he was unable to sit, stand, or lift anything heavy. *Id.* He said he experienced "massive cluster type migraine headaches" weekly. *Id.* He indicated he needed to avoid the conditions of his former job, which had been extremely demanding and stressful. *Id.* He noted the Navy had approved him for disability after he explained what was going on and which medications he had to take. *Id.*

Plaintiff stated he took Norco for pain in the morning and evening and had started taking it the day after the car accident. Tr. at 43. He said he took Imitrex for migraines two or three times a week or more, when he felt a migraine coming on. *Id.* He denied smoking, except for an occasional cigar, and said he would drink a beer occasionally, as well. Tr. at 43–44.

Plaintiff testified his grandsons had been unable to remain in school during the COVID-19 pandemic because of his wife's autoimmune deficiency. Tr. at 44. He explained that he would get up with his grandsons each morning to make sure they were "dialed into their school" for remote learning and would monitor them for most of the day. *Id.* He said he lived close to the store and would get groceries as needed. *Id.* He indicated he took care of his

wife, and she took care of him. *Id.* He said his grandsons did most of the laundry and the older grandson cut the grass. *Id.* He stated he was teaching his grandsons to cook, but he mostly prepared microwave dinners, frozen pizza, and cereal. Tr. at 45.

Plaintiff confirmed his ability to use the internet. *Id.* He said he conducted online banking and communicated with his grandsons' teachers by email. *Id.* He denied using social media. *Id.* He said his hobby was watching television with his wife. *Id.* He indicated he drove his grandsons to tennis practice. *Id.* He said he avoided enrolling them in most organized sports because of the need to transport them and noted that they could ride their bikes to the tennis courts. Tr. at 45–46. He stated he had purchased a ping-pong table for his grandsons, but was unable to use it himself because he would develop muscle spasms if he attempted to swing the paddle. Tr. at 46.

Plaintiff confirmed that Dr. White had instructed him to remain out of work in June 2018 and had never release him to return to work. *Id.* He stated he had stopped seeing Dr. White because Dr. White had decreased his patient load. Tr. at 47. He said he had transferred his treatment to his primary care physician because he was in "maintenance mode" and only needed prescription medications. *Id.*

Plaintiff testified the injections Dr. Joye administered had initially reduced his back pain, but his last injections had lasted only a few weeks. Tr.

at 47–48. He said he had to avoid moving laterally because it increased his pain. Tr. at 48. He stated his pain was exacerbated by twisting in the wrong direction, bending down too hard, picking up his right leg too high, and climbing stairs. *Id.* He denied having a limp when initiating ambulation, but said he developed a limp after walking about a block. *Id.* He described tightening from his right buttock through his right knee and knee spasms. *Id.* He said his orthopedist had indicated his knee spasms were caused by impairment to his sciatic nerve. Tr. at 49. He noted his first injection had provided almost immediate relief that had lasted two months, but his pain had returned and had "c[o]me back hard." *Id.* He said he had lost faith in the injections because they presented risks and the last one had only provided a couple of weeks of relief. *Id.*

Plaintiff testified he could only sit in a regular chair for 15 to 20 minutes at a time. Tr. at 50. He said he used a zero-gravity chair in his living room that took pressure off his lower back. *Id.* He stated his grandsons did most of the household chores and he supervised them. *Id.* He indicated he had some difficulty putting a sock on his right foot. Tr. at 51. He stated he had been experiencing shoulder pain for about a year. *Id.* He explained he had developed bursitis when he attempted to lift weights while lying flat on a bench to keep his arms and upper body fit without putting pressure on his lower back. *Id.* He stated he developed shoulder pain when he lifted a 45-

pound bar with 25-pound weights on each side. *Id.* He indicated he could lift a 15-pound basket of laundry at counter-level. *Id.* He said he experienced pinching in his shoulders when he lifted them above 90 degrees. Tr. at 53. He noted his doctor wanted to operate, but he was reluctant to undergo additional surgery. *Id.*

Plaintiff testified he experienced migraines at least three times a week on average. *Id.* He explained that if he took medication immediately upon noticing his sinuses starting to constrict, his migraine might last only a few hours, but if he waited to take his medicine until the light and noise started to bother him, he would be down for at least eight hours. Tr. at 53–54. He confirmed that Dr. White had been concerned about the side effects from Imitrex, given how frequently he was requiring it. Tr. at 54. He indicated he felt that his migraines were sometimes triggered by stress. Tr. at 55. He stated exposure to light made his migraines worst. *Id.* He said he had to rest when he was experiencing a migraine. *Id.*

Plaintiff said his wife monitored his grandsons when he was incapacitated by a migraine. *Id.* He explained that his wife's daughter was a drug addict, and both of their grandsons were born with drug addictions and were "a real handful in the beginning," but had matured into "good, smart boys." Tr. at 55–56. He stated other family members had come over to assist him and his wife when their grandsons were younger. Tr. at 56.

Plaintiff testified he experienced nausea and occasional vomiting with his migraines. *Id.* He said they impaired his ability to do everything. *Id.*

Plaintiff indicated he was able to assist his grandsons with questions while they were doing their schoolwork. *Id.* However, he stated his older grandson would generally oversee his brother and the two had grown closer by participating in remote learning together. Tr. at 56–57.

Plaintiff confirmed that he supervised other employees in his PRW. Tr. at 59. He said he had been the lead for logistics, where he supervised 17 employees in his last position and 200 employees prior to moving to Charleston. Tr. at 59–60.

### ii.    Second Hearing

At the hearing on December 8, 2022, Plaintiff indicated he had not yet started Botox treatment for migraines. Tr. at 880. He stated he had been scheduled to see his neurologist earlier in the week, but the neurologist cancelled due to a family emergency and had not rescheduled. *Id.* He said he had cancelled rotator cuff repair surgery due to illness and planned to reschedule it in January. Tr. at 881.

Plaintiff testified his migraines had worsened since March 2022, when he reported to Dr. Hansen that they were occurring once a week. *Id.* He said he had been placed on a waiting list to begin treatment with Dr. Hughes, the neurologist, and had to reschedule his appointment when his wife fell ill. *Id.*

He stated he was presently experiencing migraines four or more times per week and continued to take Imitrex. *Id.* He indicated bright and fluorescent lights and stress tended to trigger his migraines. Tr. at 881, 883.

Plaintiff testified he was able to use a computer, but did not use it for more than 15 to 20 minutes a day. Tr. at 882–83. He stated he had not been able to assist his grandsons with their homework over the prior year and paid for them to receive tutoring. Tr. at 883. He noted his migraines affected his ability to drive, but he continued to drive his grandsons to school, except on a few days when he could not take them and others had driven them. *Id.*

Plaintiff testified that he experienced excruciating pain with reaching. Tr. at 884. He could not recall if he had attempted to treat his migraines with Botox in the past. *Id.*

### b.    Vocational Expert Testimony

#### i.    First Hearing

Vocational Expert ("VE") Mark Stebnicki, Ph.D., reviewed the record and testified at the hearing on May 4, 2021. Tr. at 57–63. The VE categorized Plaintiff's PRW as a logistics embarkation specialist, *Dictionary of Occupational Titles* ("*DOT*") No. 222.387-050, requiring medium exertion and a specific vocational preparation ("SVP") of 5. Tr. at 58. The ALJ explained to the VE that the state agency had classified Plaintiff's PRW as a logistics management specialist, *DOT* No. 019.167-010, requiring sedentary exertion

and an SVP of 8. Tr. at 58–59. The VE stated the difference in classification would depend on the amount of supervision that Plaintiff performed. Tr. at 59. After the ALJ obtained additional information as to the number of employees Plaintiff supervised, the VE testified that his PRW included both that of embarkation specialist and logistics management specialist, but he performed the job of logistics management specialist at the medium exertional level. Tr. at 60.

The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform sedentary work with the following restrictions: occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds, "[INAUDIBLE] and crawl," and frequently reach overhead with the bilateral upper extremities. Tr. at 61. The VE testified that the hypothetical individual would be able to perform Plaintiff's PRW as a logistics management specialist as generally performed. *Id.* The ALJ asked the VE if his testimony was consistent with the *DOT. Id.* The VE stated it was, except that his testimony as to overhead reaching was based on his education, training, and work experience. *Id.*

Plaintiff's counsel asked the VE to consider that Plaintiff indicated in his work history report that he did not perform any hiring or firing tasks. Tr. at 62. She asked if that information changed his classification of Plaintiff's PRW. *Id.* The VE stated Plaintiff's testimony indicated he had input in hiring

28

and firing decisions. *Id.* Plaintiff's counsel asked the VE if the *DOT* adequately qualified military civilian jobs. *Id.* The VE stated he was able to cross-reference military civilian jobs with titles in the *DOT. Id.* Plaintiff's counsel asked if there would be significant vocational adjustment between performance of a military civilian position and a job described as generally performed in the *DOT. Id.* The VE testified the military occupation would generally include requirements beyond that found in the civilian occupation. Tr. at 63.

Plaintiff's counsel asked the VE to consider that the individual would be off-task for 25% of the workday due to migraine headaches. *Id.* She asked if this would affect the individual's ability to perform Plaintiff's PRW. *Id.* The VE testified it would because 15% or more of time off-task would be considered excessive. *Id.*

Counsel asked the VE if an individual limited to unskilled work would be able to perform Plaintiff's PRW. *Id.* The VE confirmed that a restriction to unskilled work would not allow for Plaintiff's PRW. *Id.*

ii.    Second Hearing

VE Dawn Bergren reviewed the record and testified at the hearing on December 8, 2022. Tr. at 885–86. She classified Plaintiff's PRW as a logistics specialist, *DOT* No. 019-167-010, requiring sedentary exertion per the *DOT* and medium exertion as performed and an SVP of 8. Tr. at 886. Plaintiff's

counsel asked the VE if Plaintiff's PRW might be considered a composite job based on his description of spending 40% of his time at his desk and 60% of his time traveling to meetings. *Id.* The VE said this information would not change the job classification. *Id.* Plaintiff's counsel asked the VE if Plaintiff's job classification would differ based on the requirement that he hold a secret or better security clearance. *Id.* The VE stated it would not. *Id.*

Plaintiff's counsel asked if an individual limited to low-stress work would be able to perform Plaintiff's PRW. *Id.* The VE testified a restriction to low-stress work would eliminate Plaintiff's PRW. *Id.*

### 2.    The ALJ's Findings

In her decision dated January 18, 2023, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.
2. The claimant has not engaged in substantial gainful activity since June 18, 2018, the alleged onset date (20 CFR 404.1571, *et seq.*).
3. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, osteoarthritis of the bilateral shoulders, right knee osteoarthritis, and obesity (20 CFR 404.1520(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except he can occasionally climb ramps and stairs, but never climb ladders, ropes and scaffolds. He can occasionally stoop, kneel, crouch and

          crawl. He can frequently reach overhead with bilateral upper extremities.

6.    The claimant is capable of performing past relevant work as a logistics management specialist and logistics engineer. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from June 18, 2018, through the date of this decision (20 CFR 404.1520(f)).

Tr. at 856–66.

II.   Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ failed to properly evaluate evidence regarding Plaintiff's migraines;

2)    the ALJ did not evaluate the medical opinions in accordance with the applicable regulations; and

3)    the evidence does not support the ALJ's conclusion that Plaintiff's subjective complaints were not credible.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.   Legal Framework

1.   The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5)

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant

whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to

---

work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

   2. The Court's Standard of Review

  The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

  The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Migraines

Plaintiff argues the ALJ erred in assessing migraines as a non-severe impairment. [ECF No. 8 at 16]. He maintains he experiences migraines regularly, despite ongoing treatment, and they are the main reason he is unable to work. *Id.* at 16. He asserts the record reflects that Drs. White and Hansen provided ongoing treatment for migraines, prior to Dr. Hansen referring him to Dr. Hughes, and that he continued to experience migraines from twice monthly to daily over the relevant period. *Id.* at 17. He contends the record reflects functional limitations for minimal stress, limited movement, mildly-decreased cognitive functioning, computer restrictions, and missing work due to severe headaches over greater than a 12-month period.

*Id.* at 18. He asserts the ALJ's error in evaluating the severity of his migraines caused her to present an incomplete hypothetical question to the VE, incorrectly assess his RFC, and conclude he could perform his PRW. *Id.* He points out that in finding his migraines non-severe because they resolved with medications and a nap, the ALJ ignored the fact that they would still cause him to be absent or off-task. [ECF No. 12 at 2–3]. He states that "[b]y repeatedly citing normal neurological findings[,] the ALJ misconstrued how migraines are diagnosed and consequently disregarded [his] complaints due to the lack of immaterial evidence," resulting in her failure "to make specific findings regarding the frequency, duration, and severity of [his] migraines." *Id.* at 4.

The Commissioner argues substantial evidence supports the ALJ's assessment that Plaintiff's migraines were not severe. [ECF No. 11 at 12]. She maintains the ALJ proceeded beyond step two of the evaluation process and considered Plaintiff's migraines in the RFC assessment by restricting him from climbing ladders, ropes, or scaffolds. *Id.* at 12–13. She asserts the ALJ properly supported her conclusion with references to Plaintiff's intermittent and conservative migraine treatment. *Id.* at 13–14. She contends the ALJ appropriately relied on Plaintiff's activities of daily living ("ADLs") in finding his migraines were non-severe. *Id.* at 15–16.

A severe impairment "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). "An impairment is 'not severe' or insignificant only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience. *Richenbach v. Heckler*, 808 F.2d 309, 311 (4th Cir. 1985) (citing *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984)); *see also* 20 C.F.R. § 404.1522(a) (stating "[a]n impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities").

If an ALJ erroneously characterizes an impairment as non-severe at step two, her error may be harmless if she proceeds beyond step two in the evaluation process and considers the impairment in assessing the claimant's RFC. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."); *see also Washington v. Astrue*, 98 F. Supp. 2d 562, 580 (D.S.C. 2010) (providing that the court "agrees with other courts that find no reversible error when the ALJ does not find an impairment severe at step two provided that he or she considers that impairment in subsequent steps").

The Social Security Administration issued SSR 19-4p "to explain [its] policy on how [it] establishes that a person has a [medically-determinable impairment] of a primary headache disorder and how [it] evaluate[s] primary headache disorder in disability claims." SSR 19-4p, 2019 WL 4169635, at *2. If a claimant establishes a primary headache disorder as a medically-determinable impairment, but it does not meet or equal a listing, the ALJ should consider and discuss its limiting effects when assessing the claimant's RFC. SSR 19-4p, 2019 WL 4169635, at *7.

An ALJ must base a claimant's RFC assessment on all the relevant evidence in the case record and account for all the claimant's medically-determinable impairments. *See* 20 C.F.R. § 404.1545(a). She must support the RFC assessment with a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite "specific medical facts (*e.g.*, laboratory findings) and non-medical evidence (*e.g.*, daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7 (1996). She must explain how material inconsistencies or ambiguities in the record were considered and resolved. *Id.* "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v.*

*Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (citing *Cichocki v. Astrue*, 729 F.3d 177 (2d Cir. 2013)).

The ALJ provided the following explanation of her consideration of Plaintiff's migraines at step two:

> The claimant also alleges disability due to migraine headaches. I find that this impairment is non-severe. After considering the evidence of record, I find that the claimant's medically determinable migraine headache impairment could reasonably be expected to produce the alleged symptoms; however the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent for the reasons explained below.
>
> In June 2018, after the claimant was involved in a motor vehicle accident, he began seeing neurologist Marshall White, M.D., for pain management (14F/17). The claimant complained of migraines and back pain. An examination was not performed. Dr. White prescribed Imitrex and Verapamil for migraines and Norco for back pain (14F/15–21). In February 2019, at follow-up appointment, the claimant stated he continued to have headaches, but the Verapamil reduced his post-concussive-type headaches to a large degree. Dr. White renewed the claimant's Verapamil and Norco medications. An examination was not performed (5F/4–5). In July 2019, at a follow-up appointment, Dr. White's treatment notes do not indicate that the claimant had any complaints or concerns. An examination was not performed. Dr. White stated he was renewing the claimant's Verapamil and Norco medications (14F/10). Thereafter, the record does not indicate the claimant continued treatment with Dr. White for migraine headaches.
>
> In February 2020, at a medication refill appointment with his primary care provider, Harriet Hansen, D.O., the claimant stated that he was having migraines a "couple times a month, he takes Imitrex right away and it helps resolve the headache with a nap." The claimant's exam was unremarkable. Dr. Hansen refilled the claimant's Imitrex medication (19F/15). In August 2020, at a medication refill appointment, the claimant reported to Dr.

Hansen that he was having migraines three times a week, but again stated he took the Imitrex medication right away and it helped resolve the headache with a nap. An examination was not performed. Dr. Hansen refilled the claimant's Imitrex and prescribed amitriptyline (19F/22). In May 2021, at a medication follow-up appointment, the claimant reported that migraine headaches were coming more often—about three to four times a week. Again, the claimant stated when he took the Imitrex right away, it helped resolve his headache with a nap. The claimant's exam was unremarkable. Dr. Hansen recommended a trial of Topamax and referred the claimant to neurology. Dr. Hansen also asked the claimant to keep a headache log (21F/22). In October 2021, a follow-up appointment, the claimant advised Dr. Hansen that he still had migraines, but they had decreased to once a week. Again, he stated he took his Imitrex right away and it helped resolve his headaches with a nap. He did not like how the amitriptyline made him feel so he stopped taking it. Dr. Hansen did not examine the claimant. Again, Dr. Hansen recommended a neurology appointment for the claimant to try newer agents. Dr. Hansen noted that the claimant still had his previous neurologist referral. The claimant's Imitrex was refilled. Dr. Hansen did not indicate that the claimant produced a headache log as requested at the previous appointment (21F/11; 23F/5).

In November 2022, the claimant presented for a new patient appointment at Tidewater Neurology with Thomas Hughes M.D. The claimant reported a 20-year history of migraines, which were previously once a month, but now he had daily headaches. He also stated he treated with Imitrex, but the medication was no longer as effective. The claimant complained his headaches affected his activities of daily living and quality of life. The claimant's neurological exam was unremarkable. Dr. Hughes assessed the claimant with chronic migraine without aura. Dr. Hughes advised the claimant that he may have limited success as long as he continues with chronic opioid therapy. Dr. Hughes added Botox to the claimant's treatment regimen and encouraged him to exercise daily (26F/2–3).

Tr. at 857–58.

The ALJ wrote:

> Accordingly, based on the above, the conclusion that the
> claimant's migraine headache impairment is not severe as it does
> not significantly limit his ability to perform basic work activities
> for 12 consecutive months is consistent with the objective medical
> evidence and other evidence. Nonetheless, the claimant's non-
> severe impairment has been considered in combination with his
> severe impairment in assessing the claimant's residual functional
> capacity, and further accommodations are not necessary (20 CFR
> 404.1545(a)(2)).

Tr. at 859. In discussing the RFC assessment, she wrote: "In addition,
although the claimant's headache impairment was found nonsevere above,
out of abundance of caution and noting pain coinciding with occurrences of
headaches, the claimant is restricted from climbing ladders/ropes/scaffolds."
Tr. at 864.

The Fourth Circuit recently considered an argument similar to the one
Plaintiff presents here in *Woody v. Kijakazi*, Case No. 22-1437, 2023 WL
5745359 (4th Cir. Sept. 6, 2023). The court wrote:

> Woody contends the ALJ failed to adequately explain why the
> limitations included in the RFC sufficiently accounted for her
> headaches. Most significantly, she contends the ALJ erred by not
> making specific findings regarding how often she would be absent
> from work due to the frequency and severity of her headaches.
> We agree. The vocational expert testified a hypothetical person
> would be precluded from maintaining full time employment if she
> were absent more than once a month. The record shows that,
> even after receiving treatment that reduced the frequency of her
> headaches, Woody still reported getting headaches about once a
> week. And although Woody told her physicians the severity of her
> headaches had lessened with treatment, the record does not
> establish whether her headaches nevertheless remained severe
> enough to cause her to be absent from work when they occurred.

> The ALJ did not make specific factual findings on that point. The ALJ's failure to reach an "express conclusion in the first instance" on the potentially dispositive issue of whether the frequency and severity of Woody's headaches would cause her to be absent from work more than once a month—or to explain how, despite any potential absences, the evidence supported his finding that the limitations included in the RFC assessment accounted for Woody's impairments—is an error or law that necessitates remand.

*Id.* (citing *Dowling v. Comm'r of Soc. Sec. Admin.*, 986 F.3d 377, 388 (4th Cir. 2021); *Thomas v. Berryhill*, 916 F.3d 307, 311–12 (4th Cir. 2019).

The court recognizes "unpublished opinions are not binding precedent in this circuit." *United States v. Ruhe*, 191 F.3d 376, 392 (4th Cir. 1999). However, the court finds persuasive the Fourth Circuit's reliance in *Woody* on *Dowling* and *Thomas*, which serve as binding precedent. In *Dowling*, 986 F.3d at 388, the court found the ALJ "never specifically discussed the extent to which Appellant's alleged sitting problems impacted her ability to perform sedentary work." In *Thomas*, 916 F.3d at 311–12, the court determined the ALJ's RFC analysis was flawed, among other reasons, based on her failure to draw an "explicit conclusion about how [the claimant's] mental limitations affected her ability to perform job-related tasks for a full workday" and to "sufficiently explain how she weighed significant evidence related to [claimant's] mental-health treatment." In all three cases, the court found the ALJs' decisions contained too little logical explanation for it to conduct meaningful review.

Although the ALJ provided a lengthy explanation to support her finding that Plaintiff's migraines were non-severe, she failed to resolve conflicting evidence as to the frequency and duration of Plaintiff's migraines and their limiting effects. The record reflects Plaintiff's reports to his medical providers of migraines that occurred as often as daily and as infrequently as twice a month beginning in June 2018. *See, e.g.*, Tr. at 467 (October 17, 2018 (daily)), 474 (August 15, 2018 (daily)), 475 (June 29, 2018 (several per week)), 626 (July 20, 2019 (three times per month)), 696 (May 9, 2019 (daily)), 747 (September 1, 2020 (three times a week)), 803 (February 19, 2020 (twice a month)), 804 (February 24, 2020 (twice a month)), 810 (August 26, 2020 (three times a week)), 1163 (October 28, 2021 (once a week)), 1174 (May 24, 2021 (three to four times a week), 1630 (March 7, 2022 (once a week), 1664 (November 22, 2022 (daily)).

Assuming the ALJ found Plaintiff's migraines were resolved by taking Imitrex and a nap, she did not explain how often and how long he would be incapacitated and how this would affect his ability to complete a normal workday and workweek. Plaintiff testified in the first hearing that if he took medication immediately upon noticing his sinuses starting to constrict, his migraine might last only a few hours, but if he waited to take his medicine until the light and noise started to bother him, he would be down for at least eight hours. Tr. at 53–54. Even if Plaintiff required only a few hours of rest

away from the workstation when experiencing a migraine, he would still be off-task for some portion of the workday. The first VE testified that 15% or more of time off-task would be considered excessive. Tr. at 63. The restriction the ALJ included for no climbing of ladders, ropes, or scaffolds did not address Plaintiff's need to take a nap each time he experienced a migraine.

In light of the Fourth Circuit's decisions in *Thomas*, *Dowling*, and *Woody*, the undersigned cannot find the ALJ provided the explanation required under the regulations. The ALJ's failure to assess Plaintiff's capacity to perform relevant functions and complete a normal workday and workweek on a regular and continuing basis necessitates remand. *See Mascio*, 780 F.3d at 636.

### 2. Medical Opinions

Plaintiff argues the ALJ did not evaluate the medical opinions of record in accordance with 20 C.F.R. § 404.1520c. [ECF No. 8 at 19–26].

The Commissioner argues substantial evidence supports the ALJ's evaluation of the opinion evidence. [ECF No. 11 at 16–21]. She claims the ALJ's failure to use the terms supportability and consistency with respect to particular opinions is not determinative, as a review of her entire decision reflects her consideration of those factors. *Id.* at 20–21.

"The RFC assessment must always consider and address medical source opinions." SSR 96-8p, 1996 WL 374184, at *7. "If the RFC assessment

conflicts with an opinion from a medical source, the adjudicator must explain why the medical opinion was not adopted." *Id.* An ALJ is required to evaluate all the medical opinions of record based on these factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the medical opinion. 20 C.F.R. § 404.1520c(b), (c). However, she is only required to discuss the supportability and consistency of each medical source's opinion, as these factors are considered most important in assessing its persuasiveness. 20 C.F.R. § 404.1520c(a), (b)(2). Evaluation of the supportability factor requires the ALJ to consider a medical opinion more persuasive based on "the more relevant . . . objective medical evidence and supporting explanations" the medical source provides. 20 C.F.R. § 404.1520c(c)(1). The ALJ's assessment of the consistency factor requires she consider a medical source's opinion more persuasive if it is consistent "with the evidence from other medical sources and nonmedical sources in the claim." 20 C.F.R. § 404.1520c(c)(2).

Although ALJs have discretion in evaluating the persuasiveness of medical opinions, substantial evidence must support the ALJ's conclusions as to the supportability and consistency factors. If the ALJ materially errs in evaluating these factors, the court may remand the case. *See Flattery v. Commissioner of Social Security Administration*, C/A No. 9:20-2600-RBH-MHC, 2021 WL 5181567, at *8 (D.S.C. Oct. 21, 2021) (concluding substantial

45

evidence did not support the ALJ's evaluation of the supportability factor where he ignored the claimant's continuing treatment with the medical provider and portions of the provider's treatment notes), *R&R adopted by* 2021 WL 5180236 (Nov. 8, 2021); *Joseph M. v. Kijakazi*, C/A No. 1:20-3664-DCC-SVH, 2021 WL 3868122, at *13 (D.S.C. Aug. 19, 2021) (finding the ALJ erred in assessing a medical opinion pursuant to 20 C.F.R. § 404.1520c and § 416.920c because he misconstrued the date the plaintiff last saw the medical provider, neglected the continuing treatment relationship, and erroneously claimed the last treatment visit was prior to the plaintiff's alleged onset date), *R&R adopted by* 2021 WL 3860638 (Aug. 30, 2021).

The undersigned considers each opinion Plaintiff references based on the foregoing authority.

### a.    State Agency Medical Consultants' Opinions

Dr. McCall opined that Plaintiff had a maximum RFC for the following: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; and occasionally reach overhead bilaterally. Tr. at 74–76. Dr. Lewis found Plaintiff had the following maximum RFC: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10

pounds; stand and/or walk for a total of four hours; sit for a total of about six hours in an eight-hour workday; occasionally push and pull with the right lower extremity; frequently push and pull with the left lower extremity; never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs, balance, stoop, kneel, and crawl; frequently crouch; and avoid concentrated exposure to vibration and hazards. Tr. at 93–96.

The ALJ summarized Drs. McCall's and Lewis's opinions and wrote the following:

> Support for the frequent/occasional balance, occasional push/pull with right lower extremity and frequent with the left lower extremity, occasional overhead reaching, and avoidance of vibration and hazards is not well explained or supported by the evidence as a whole, which typically shows a normal gait, good strength of the upper and lower extremities, good range of motion, normal sensation and normal coordination. These restrictions are also not supported by the claimant's activities of daily living, which show that he drives an automobile, bench presses 280 pounds, does yard work, cooks, and shops in stores.

Tr. at 865.

Plaintiff maintains the ALJ did not provide a narrative discussion explaining her reasons for declining to restrict him to frequent or occasional balancing, occasional pushing and pulling with the right lower extremity, frequent pushing and pulling with the left upper extremity, occasional overhead reaching, and avoidance of vibration and hazards, as indicated by the state agency medical consultants, and did not address the consistency of

the state agency consultants' opinions with the other medical opinions. [ECF No. 8 at 21–23].

The Commissioner asserts the ALJ considered and explained her reasons for finding the state agency medical consultants' opinions generally persuasive, except with respect to the restrictions set forth above, as those restrictions were not well-explained and were inconsistent with the evidence as a whole. [ECF No. 11 at 19–20].

The ALJ considered the supportability and consistency of Drs. McCall's and Lewis's opinions, as she stated the state agency consultants failed to adequately explain their reasons for including those restrictions and such restrictions were inconsistent with observations on physical exams and Plaintiff's ADLs. *See* Tr. at 865. However, the ALJ's conclusory statements are not fully supported by the evidence. Dr. McCall appears to have relied heavily on Dr. Hewett's observations of reduced ROM of the spine, positive SLR, stiff gait, much effort required on tandem, heel, and toe walk, 4/5 right foot dorsiflexion, 1+ patellar reflexes on the left, absent patellar reflexes on the right, and decreased sensation in the right medial thigh and lower leg. Tr. at 75. Dr. Lewis relied on additional evidence, including Dr. Maguire's observations, and supported his decision by noting imaging reports, Plaintiff's history of back and knee surgeries, steroid injections to the right knee, TESIs to the lumbar spine, and observations of subtle limp, positive

SLR on the right, decreased ROM of the bilateral knees, and 3/4 motor strength in the right lower extremity. Tr. at 95–96. The ALJ did not explain how the evidence Drs. McCall and Lewis relied on to support the restrictions they included failed to support those restrictions.

b.    Dr. White's Opinion

On September 26, 2018, Dr. White noted Plaintiff required minimal stress and limited physical movement due to his medical conditions. Tr. at 472. On May 9, 2019, he provided a more detailed letter concerning Plaintiff's limitations. Tr. at 696.

The ALJ addressed Dr. White's May 2019 letter as follows:

> Dr. White stated that the claimant's condition requires minimal stress and limited movement. Dr. White also stated, at this time, it is unclear if the claimant will regain full functional ability as it is less than one year since his date of injury. The claimant requires narcotic pain medications for chronic pain, he continues to suffer from daily post concussive type headaches and muscle spasms. Dr. White further stated it is likely the claimant['s] symptoms (low back pain, leg and groin pain, and post-concussive headaches) will remain permanent (14F/12). I do not find this opinion persuasive. It is not supported by Dr. White's own treatment notes which do not show any abnormal exam findings. Dr. White's opinion is also inconsistent with the record as a whole, where treatment notes do not indicate that the claimant has complained his migraines were caused by stress and exam findings show no abnormal neurological results.

Tr. at 858–59.

Plaintiff argues the ALJ provided invalid reasons for finding Dr. White's opinion was not persuasive, as normal neurological findings do not

refute evidence as to migraines and the ALJ did not consider the consistency of Dr. White's opinion with the other medical evidence. [ECF No. 8 at 23–24].

The Commissioner maintains the ALJ explained that Dr. White's opinion was not supported by his treatment notes and inconsistent with other evidence showing Plaintiff's headaches resolved with medication and a nap and did not result in physical functional limitations. [ECF No. 11 at 17].

Contrary to Plaintiff's argument, the ALJ considered the supportability and consistency factors in assessing the persuasiveness of Dr. White's opinion, as he found neither Dr. White's exam findings nor "the record as whole" reflected complaints of migraines caused by stress or abnormal neurological exam findings. *See* Tr. at 858–59. However, substantial evidence does not support the ALJ's conclusions as to the supportability and consistency factors. Because primary headache disorders are not diagnosed based on certain findings on neurological exam, a lack of abnormal neurological exam findings does not provide a rational basis for disregarding Dr. White's opinion. *See* SSR 19-4p, 2019 WL 4169635, at *5–*8 (indicating diagnostic criteria for migraines without aura, explaining how a primary headache disorder is established as a medically-determinable impairment, and indicating how primary headache disorders are considered in assessing a claimant's RFC). Furthermore, the record refutes the ALJ's assertion that Plaintiff had not complained to other providers of migraines caused by stress,

as Plaintiff informed Drs. Hewett and Hughes that stress was one of the factors that triggered his migraines. Tr. at 626, 1664.

c.      Dr. Hewett's Opinion

Dr. Hewett found Plaintiff was "likely to have limitations regarding his ability to carry and reach given aggravation of his low back pain" and was "likely to require flexibility in how he positions himself throughout the day because any given posture causes pain for a prolonged period of time and because standing/walking may pose a fall hazard given his knee weakness." Tr. at 629.

The ALJ found Dr. Hewett's opinion "generally persuasive," although somewhat vague. Tr. at 865. She wrote:

> [H]er opinion that the claimant will have carrying/reaching and flexibility limitations is supported by her exam findings that showed a stiff gait, with decreased right lower extremity range of motion, sensation, and strength, but 5/5 grip strength with good fine motor movement. Her opinion is also consistent with the above residual functional capacity which limits the claimant to lifting/carrying 10 pounds occasionally, standing/walking up to two hours out of eight hours and occasional ramps/stairs, stooping, kneeling crouching and crawling and frequent overhead reaching.

*Id.*

Plaintiff contends that despite finding Dr. Hewett's opinion generally persuasive, the ALJ omitted a portion of it without discussion and failed to address the opinion's consistency with the other evidence. [ECF No. 8 at 24].

The Commissioner contends the ALJ explained that she considered the support for Dr. Hewett's opinion in her examination record and found it generally persuasive, despite its vagueness and lack of clarity, and consistent with the established RFC for a reduced range of sedentary work. [ECF No. 11 at 18–19].

The ALJ erred in relying on consistency between the RFC assessment and Dr. Hewett's opinion. It is error for an ALJ to express a claimant's RFC first and subsequently conclude limitations are consistent with that RFC. *See Thomas*, 916 F.3d at 312; *Monroe v. Colvin*, 826 F.3d 176, 188 (4th Cir. 2016). Instead, the ALJ is to consider the consistency of a medical opinion with "evidence from other medical sources and nonmedical sources in the claim." 20 C.F.R. § 404.1520c(c)(2). The ALJ failed to consider whether Dr. Hewett's opinion was consistent with the other evidence of record.

Despite finding Dr. Hewett's opinion generally persuasive, the ALJ failed to address her indication that Plaintiff would require flexibility in how he positioned himself throughout the day. The undersigned agrees with the ALJ's assessment that Dr. Hewett's opinion was somewhat vague and lacked clarity with respect to this limitation, but the ALJ neglected her duty to resolve conflicting evidence in neither including in the RFC assessment a provision for changing positions nor explaining why she declined to include such a provision. *See* SSR 96-8p, 1996 WL 374184, at *7.

d.    Dr. Maguire's Opinion

Dr. Maguire opined that Plaintiff would have difficulty with work requiring a lot of standing, walking, squatting, bending, and crawling, especially over an eight-hour day and would be subjectively limited during migraine episodes. Tr. at 749.

The ALJ considered Dr. Maguire's opinion "somewhat persuasive," writing:

> Dr. Maguire's limitations for the claimant are vague and support for the limitations are not well explained as he states he relies upon the claimant's subjective complaints. However, his opinion is generally consistent with his exam findings, which showed a subtle limp, ability to get on and off the exam table without difficulty, no back tenderness, positive right straight leg test, decreased range of motion of the spine and right knee, no knee instability or tenderness, and inability to squat, toe, heel or tandem walk. Dr. Maguire's opinion is also generally consistent with the above residual functional capacity which limits the claimant's lifting/carrying, standing/walking, postural activities and overhead reaching.

Tr. at 865–66.

Plaintiff asserts that in finding Dr. Maguire's opinion "somewhat persuasive," the ALJ did not consider the consistency of the opinion with the other evidence and failed to address the portion of the opinion pertaining to his ability to persist for an eight-hour day. [ECF No. 8 at 25].

The Commissioner maintains the ALJ explained that the established RFC accommodated Dr. Maguire's opinion, given his exam findings and

despite the vagueness of his limitations and his lack of explanation. [ECF No. 11 at 19].

For the reasons explained above, the ALJ erred in considering consistency between Dr. Maguire's opinion in the RFC assessment, as opposed to consistency between Dr. Maguires' opinion and the other evidence of record. She neglected her duty to "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved," in failing to either include restrictions in the RFC assessment for Plaintiff to be off-task due to migraine episodes or explain her reasons for declining to include such a provision. *See* SSR 96-8p, 1996 WL 374184, at *7.

e.    Dr. Custer's Opinion

Dr. Custer noted that Plaintiff could have "some mild decrease in his cognitive functioning due to pain." Tr. at 624.

The ALJ wrote the following as to Dr. Custer's exam and opinion:

In June 2019, the claimant underwent a psychological consultative examination, which was performed by John Custer, M.D. Dr. Custer evaluated the claimant and diagnosed somatic symptom disorder and mood disorder secondary to a medical illness (chronic back pain). Dr. Custer noted that there was a report of anxiety in the claimant's file, but the claimant gave no history during this exam of any type of anxiety symptoms. Dr. Custer also noted that there was a report of cognitive side effects of medication, but again there was no real evidence of such. Dr. Custer stated that it could be that the claimant has had some mild decrease in his cognitive functioning due to pain (9F/4). I find Dr. Custer's opinion generally persuasive. It is supported by

54

his exam findings, which showed intact cognition. It is also consistent with the record, which consistently reflects normal mental status examinations.

Tr. at 860.

Plaintiff maintains that despite finding Dr. Custer's opinion generally persuasive, the ALJ failed to explain how a mild decrease in cognitive functioning would impact his ability to perform his highly-skilled PRW. [ECF No. 8 at 25].

The Commissioner declined to address the ALJ's consideration of Dr. Custer's opinion. *See generally* [ECF No. 11 at 16–21].

Despite having specifically acknowledged Dr. Custer's opinion that Plaintiff might have "some mild decrease in his cognitive functioning due to pain" and having found Dr. Custer's opinion generally persuasive, the ALJ neither included any mental restrictions in the RFC assessment, nor explained that Dr. Custer's impression did not warrant any mental functional limitations. In failing to do either, the ALJ ignored her duty to explain how material inconsistencies or ambiguities in the record were considered and resolved. *See* SSR 96-8p, 1996 WL 374184, at *7.

f.    Dr. Hansen's Opinion

Dr. Hansen indicated Plaintiff's chronic back pain and migraine headaches would make it difficult for him to perform "prolonged sitting, standing, physical or computer work." Tr. at 1648.

The ALJ "d[id] not find" Dr. Hansen's opinion "persuasive." Tr. at 866. He explained:

> It is not supported by a detailed explanation or the objective and clinical findings. Moreover, it is inconsistent with Dr. Hansen['s] own exam findings and the findings from the claimant's other providers, which do not generally show abnormal gait, reduced strength of the lower extremities, difficulty balancing, reduced sensation or any other abnormal finding that would limit the claimant's standing/ walking and sitting to less than two hours out of eight hours or that would limit computer work (4F/9; 6F/12, 23; 10F/4; 14F/4; 15F/3; 17F/3; 18F/6, 21; 25F/5, 10, 15; 26F/3).

*Id.*

Plaintiff claims the ALJ did not address the consistency factor prior to concluding Dr. Hansen's opinion was not persuasive. [ECF No. 8 at 26].

The Commissioner asserts the ALJ indicated Dr. Hansen's opinion was not supported by a detailed explanation or her treatment notes and was inconsistent with findings from Plaintiff's other medical providers. [ECF No. 11 at 17].

The undersigned finds the ALJ considered both the supportability and consistency factors in evaluating Dr. Hanson's opinion, as she specifically noted the opinion was not supported by Dr. Hanson's explanation or objective and clinical findings and was inconsistent with observations from Plaintiff's other medical providers. However, the ALJ did not consider that Dr. Hansen's opinion was consistent with other opinions she found generally persuasive.

g.    Dr. Hughes's Opinion

Dr. Hughes indicated in his treatment note that Plaintiff might need to miss work periodically for severe headaches. Tr. at 1666.

The ALJ addressed Dr. Hughes's opinion as follows:

> Dr. Hughes opined that the claimant does not have any restrictions, though, he may need to miss work periodically for severe headaches (26F/2–4). I find this opinion generally persuasive. It is supported by Dr. Hughes neurological exam findings, which were unremarkable. It is also consistent with the record as a whole, which does not show any abnormal neurological examinations.

Tr. at 858.

Plaintiff argues the ALJ failed to discuss the consistency of Dr. Hughes's opinion with the other evidence and did not include a provision in the RFC assessment for missing work, despite finding Dr. Hughes's opinion generally persuasive. [ECF No. 8 at 27].

The Commissioner claims the ALJ considered the supportability of Dr. Hughes's opinion in his examination report and its consistency with the record as a whole and was not required to include every aspect of Dr. Hughes's opinion in the RFC assessment, even though she found it generally persuasive. [ECF No. 11 at 18].

The ALJ addressed the supportability and consistency of Dr. Hughes's opinion, but she erred in relying on an absence of abnormal neurological examinations in evaluating an impairment that does not produce abnormal

neurological signs and symptoms. *See* SSR 19-4p, 2019 WL 4169635, at *5–
*8. Despite having acknowledged Dr. Hughes's impression that Plaintiff may
need to miss work periodically for severe headaches and having considered
the opinion generally persuasive, the ALJ did not satisfy the requirements of
SSR 96-8p by either including a provision in the RFC assessment to
accommodate absences due to migraines or explaining his reasons for
declining to include such a provision. SSR 96-8p, 1996 WL 374184, at *7.

### 3.    Subjective Allegations

Plaintiff argues substantial evidence does not support the ALJ's finding
that his subjective complaints were not fully credible. [ECF No. 8 at 26]. He
claims the ALJ erred in finding his migraines to be non-severe based on a
failure to seek emergency treatment for them, as he was routinely prescribed
medications to use during migraine episodes. *Id.* at 17. He further argues the
ALJ did not identify, and the record does not reflect, any activities that would
support the "active lifestyle" she considered as suggesting his migraines were
not severe. *Id.* at 17–18. He maintains the ALJ misrepresented his ADLs by
citing a report that he bench-pressed 280 pounds and indications he was the
primary caregiver for his grandchildren and was able to cook, drive, shop for
groceries, and use email, without considering his qualifying statements as to
those activities. *Id.* at 27–28; [ECF No. 12 at 1–2]. He asserts his ADLs do not

correlate to him being able to sustain his PRW for eight hours a day, five days a week. [ECF No. 8 at 27]

The Commissioner argues the ALJ explicitly considered Plaintiff's subjective complaints and explained why she found they were not entirely consistent with the record. [ECF No. 11 at 21]. She notes the ALJ considered positive and negative exam findings and the type of treatment Plaintiff received in evaluating his statements. *Id.* at 22. She maintains the ALJ cited specific inconsistencies between Plaintiff's complaints and the evidence. *Id.* at 22–23. She asserts the ALJ properly considered Plaintiff's ADLs and did not misstate or mischaracterize the record. *Id.* at 23–26.

The ALJ must evaluate the claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms based on the rules in 20 C.F.R. § 404.1529 and SSR 16-3p. "[A]n ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. § 404.1529(b)). If the ALJ concludes the impairment could reasonably produce the symptoms the claimant alleges, she is to proceed to the second step, which requires her to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to

determine the extent to which they limit the claimant's ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 404.1529(c).

The second determination requires the ALJ to consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. § 404.1529(c)(4). In undertaking this inquiry, the ALJ should consider "statements from the individual, medical sources, and any other sources that might have information about the claimant's symptoms, including agency personnel," as well as the following factors:

(1)    the claimant's ADLs;

(2)    the location, duration, frequency, and intensity of the claimant's pain or other symptoms;

(3)    any precipitating or aggravating factors;

(4)    the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms;

(6)    any measures the claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on his back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(7)    other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2017 WL 5180304, at *6.

The ALJ must explain which of the claimant's alleged symptoms she considered "consistent or inconsistent with the evidence in [the] record and how [her] evaluation of the individual's symptoms led to [her] conclusions. SSR 16-3p, 2017 WL 5180304, at *8. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at *10. The ALJ must "build an accurate and logical bridge" between the evidence and her conclusion as to the intensity, persistence, and limiting effects of the claimant's symptoms. *Monroe*, 826 F.3d at 189.

The ALJ discussed Plaintiff's subjective allegations as to migraine symptoms as follows:

> The claimant's statements about the intensity, persistence, and limiting effects of his symptoms are inconsistent. The claimant has not reported to the emergency department for acute migraine pain. He has not required an injection for urgent migraine relief. Although he was recently referred for Botox injections, in November 2022, he has not previously received Botox for his migraines. His complaints and treatment history for migraines have been intermittent. Moreover, despite the claimant's complaints that due to his migraines, he can only use a computer for a few minutes, has difficulty driving, and he cannot help his grandchildren with their homework, the evidence shows that the claimant has been fairly active and does not indicate any difficulty with using a computer or helping others. For example, in July 2019, the claimant stated that he lives with his wife, who is disabled, and his two grandchildren (ages 8 and 12), who he has been raising for the past eight years. The claimant is the

61

primary caretaker for the children. The claimant takes the
children to school and brings them home and takes them to their
functions. He helps them with homework. He is currently having
a home built to [be] more conducive to the family's evolving
lifestyle, to be fully "handicapped-friendly." He thinks his wife
will be in a wheelchair soon and his mother will probably [be]
here soon as she is becoming less independent (9F/2; 10F/3). In
October 2019, the claimant complained of shoulder pain.
However, he stated that two months prior, he was bench pressing
280 pounds, and noticed bilateral shoulder pain since, with a
little improvement and relief with Aleve (15F/10, 12). In May
2021, at the initial hearing, the claimant testified that he drives,
goes grocery shopping, takes care of his disabled wife, supervises
his grandchildren, and uses the internet for online ba[n]king and
communications with teachers and emails (Hearing testimony).

Tr. at 858.

The ALJ generally found that Plaintiff's medically-determinable

impairments could reasonably be expected to cause the symptoms he alleged,

but that his statements concerning the intensity, persistence, and limiting

effects of his symptoms were not entirely consistent with the medical and

other evidence. Tr. at 863. He wrote:

In terms of the claimant's alleged pain, physical symptoms and
treatment history, the evidence partially supports the claimant's
allegations to the extent that he has severe impairments causing
limitations, but none so severe as to be probative of all work
demands. The claimant has complained of symptoms such as
back pain, muscle spasms, radiating pain into his leg, gait
imbalance, weakness, numbness, tingling, difficulty grasping
items, and headaches. The claimant has sought treatment for his
impairments. He has treated with orthopedic specialists and pain
management specialists. The claimant has received lumbar
epidural injections, bilateral cortisone shoulder injections and
right knee injections (18F/17; 20F/3; 25F/6). He has been
prescribed medications such as Gabapentin and Norco. Prior to
the claimant's alleged onset date, the claimant underwent a right

L4–5, L5–S1 hemilaminectomy in January 2018 (6F/23). Also, prior to his alleged onset date, he underwent a right knee arthroplasty in November 2017 (4F/28).

However, the claimant has not been seen in the emergency department for acute back, shoulder or knee pain. He has not been observed to use an assistive device to aid in ambulation. He is not observed to use braces or other pain-relieving garments. Since his alleged onset date, he has not undergone shoulder, knee or spine surgery. In December 2018, a follow-up appointment for the claimant's right knee arthroplasty, the claimant reported he was doing well and continued to see improvement (4F/9). In January 2020, the claimant reported to "InterveneMD," a pain management clinic. The doctor noted that the claimant was last seen in the clinic in August 2018, for right low back, groin, buttock, and thigh and calf pain. The claimant was again reporting the same symptoms. The claimant advised the doctor that the claimant's pain had improved since his last visit, more than 75 percent in his symptoms globally from the lumbar epidural injection done for this problem about one year prior. The claimant stated that he felt the current treatment plan was helpful and, thus, requested another lumbar injection, which was provided (20F/2–3). In October 2020, the claimant again reported that his right knee was "doing well" (18F/6). Although, in September 2022, the claimant complained of chronic shoulder pain and radiating shoulder pain and his orthopedist specialist recommended a right shoulder arthroplasty, to which the claimant agreed to proceed, the claimant has not yet had the procedure. (25F/5; Hearing testimony). Thereafter, the record is devoid of any further complaints or treatment for shoulder, knee, or back pain.

Tr. at 863.

The ALJ stated "exam findings failed to establish gross and/or marked physical deficits," although he admitted they had revealed "antalgic gait; limited range of motion of the lumbar spine; positive straight leg test; pain with range of motion of the spine; radicular pain; inability to squat, walk on

toes or heels or do tandem walking; decreased sensation on right medial thigh and lower leg; decreased left patellar and absent right patellar reflexes; tenderness of the left and right acromioclavicular joints; positive left and right Hawkin's and Neer's tests; decreased range of motion of the right knee; and right knee tenderness (10F/4; 15F/14; 17F/3; 18F/6, 21: 20F/3; 25F/5, 10)." Tr. at 863–64. He noted an "MRI of the lumbar spine showed degenerative disc disease status post hemilaminectomy at L4–5 and laminectomy at L5–S1; multilevel neural foraminal narrowing, which appears slightly worsened at the L4–L5 level compared to prior July 2016 MRI, and no significant change in spinal canal narrowing at L3–L4 (14F/29)." Tr. at 864. He acknowledged "radiographs of the bilateral shoulder showed moderate osteoarthritis (15F/13)" and October 2020 imaging of the right knee "showed medial mako arthroplasty well-aligned, in good position (18F/7)." *Id.*

The ALJ further considered Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms to be "inconsistent." *Id.* He wrote:

> The claimant's alleged use and/or need of assistive devices has not been documented as medically necessary and he has not been observed using an assistive device (see 17F/2). In addition, although the claimant has alleged that he has difficulty standing and/or walking, sitting, lifting items, bending, and twisting, the claimant's described daily activities appear to be to the contrary . . . . In January 2022, the claimant reported for a dermatology appointment with complaints of a rash on his buttock. He stated he had been working outdoors in some brush the day before it started. He did not have any other complaints (23F/1). Overall

severity of the claimant's alleged impairments are called into question given inconsistencies raised across the medical evidence of record.

*Id.*

The ALJ provided a lengthy explanation to support her conclusion that there were conflicts between Plaintiff's statements and the rest of the evidence, but her explanation ignores relevant evidence, and many of the inconsistencies she references are not actual inconsistencies. The ALJ referenced an absence of ER visits for migraines or acute shoulder, back, or knee pain, but, as she also acknowledged, Plaintiff received a multitude of treatments for these impairments, including prior surgeries, injections, daily medications that included narcotics, and other medications that were used for acute exacerbations. Dr. White conditioned Plaintiff's receipt of narcotic pain medications on his agreement to a narcotics contract that presumably prevented him from seeking pain medications from other sources, including the ER. *See* Tr. at 474. Although Plaintiff reported migraines of varying frequency, he testified they were alleviated by taking his prescribed medication and a nap, rendering ER visits unnecessary. *See* Tr. at 43, 53–54. The ALJ characterized Plaintiff's migraine treatment as intermittent, but, as discussed above, the record reflects his frequent complaints of migraines and ongoing prescription treatment throughout the relevant period. She cited Plaintiff's failure to use an assistive device for ambulation, but Plaintiff

testified he developed a limp if he attempted to walk more than a block, Tr. at 48, and did not allege he required an assistive device. The ALJ found a note that Plaintiff was bench pressing 280 pounds when he injured his shoulders to be inconsistent with his statements, but the record does not suggest Plaintiff continued to bench press weight after injuring his shoulders in 2019. *See* Tr. at 727. Plaintiff had not complained of shoulder pain prior to the injury, and he testified that was attempting to bench press weight to engage in exercise without placing pressure on his lower back. *See* Tr. at 50.

The ALJ erred in considering Plaintiff's failure to obtain additional surgeries as inconsistent with his statements where his providers advised against additional back and knee surgeries and Plaintiff provided reasons for failing to pursue additional surgeries. *See* SSR 16-3p, 2017 WL 5180304, at *9–10 (providing that "[w]e will not find an individual's symptoms inconsistent with the evidence [based on the frequency or extent of treatment sought] without considering possible reasons he or she may not . . . seek treatment consistent with the degree of his or her complaints" and providing that the ALJ should consider that "[a] medical source may  have advised the individual that there is no further effective treatment to prescribe or recommend that would benefit the individual"). The record did not suggest Plaintiff was a candidate for additional surgical intervention, except for right shoulder rotator cuff repair, which Plaintiff testified he had to reschedule

because he had been ill. *See* Tr. at 881; *see also* Tr. at 696 (indication from Dr. White that Plaintiff was not a candidate for additional back surgery); 785 (Dr. McKoy's impression that Plaintiff's knee problems were likely caused by his back impairment). The ALJ also neglected to consider Plaintiff's testimony that he desired to avoid additional surgery because of complications during two prior surgeries. *See* Tr. at 42.

The Fourth Circuit has found that "[a]n ALJ may not consider the type of activities a claimant can perform without also considering the extent to which [he] can perform them." *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). In *Arakas v. Commissioner, Social Security Administration*, 983 F.3d 83, 101 (4th Cir. 2020), the court recognized the following errors in the ALJ's consideration of the claimant's ADLs in evaluating her statements: "First, he improperly disregarded her qualifying statements regarding the limited extent to which she could perform daily activities. Second, the ALJ failed to adequately explain how her limited ability to carry out daily activities supported his conclusion that she could sustain an eight-hour workday."

This ALJ appears to have made the same errors. She noted Plaintiff's abilities to use a computer for online banking, emails, and communicating with his grandsons' teachers, but those minimal activities do not conflict with his testimony that he did not use social media and could use a computer for no more than 15 to 20 minutes a day. Tr. at 45, 882–83. She also considered

1:23-cv-01126-SVH    Date Filed 09/18/23    Entry Number 14    Page 68 of 69

Plaintiff's ability to drive to the grocery store and transport his grandsons to school and activities, but she did not consider his indications that he limited his grandsons' participation in activities to avoid additional driving, enrolled them in tennis because they could ride their bikes to the courts if necessary, and sometimes required someone else to drive them to school. *See* Tr. at 45–46, 883. She referenced Plaintiff's ability to help his grandsons with their homework, but ignored his testimony that the older grandson was often helping the younger grandson and that he had to hire a tutor a year prior to the second hearing because he could no longer assist them. Tr. at 56–57, 883.

Even if Plaintiff participated in all the ADLs the ALJ cited without qualifications, she "provided no explanation as to how those particular activities . . . showed that he could persist through an eight-hour workday." *Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 263 (4th Cir. 2017); *see also Woods*, 883 F.3d at 694 (holding the ALJ erred in failing to explain how the evidence supported his conclusion that claimant "could actually perform the tasks required by 'medium work'"). "A claimant's inability to sustain full-time work due to pain and other symptoms is often consistent with [his] ability to carry out daily activities." *Arakas*, 983 F.3d at 101. "[T]he critical difference between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of

performance, as [he] would be by an employer." *Id.* (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)).

The ALJ has failed to build the requisite bridge between the evidence and her conclusion that Plaintiff retained the ability to perform his highly-skilled PRW on a regular and continuing basis. Accordingly, the undersigned finds substantial evidence does not support her evaluation of Plaintiff's statements as to the intensity, persistence, and limiting effects of his symptoms.

III.   Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

September 18, 2023                          Shiva V. Hodges
Columbia, South Carolina              United States Magistrate Judge